E-FILED
Wednesday, 22 October, 2025 02:10:22 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **LACEY GITTINGS-BARRERA, on behalf of herself and all other similarly situated,** | ) | |
| **Plaintiff,** | ) | **Case No: 4:24-cv-04167-SLD-JEH** |
| **v.** | ) | |
| **MEMORIAL HOSPITAL ASSOCIATION d/b/a MEMORIAL HOSPITAL,** | ) | |
| **Defendant.** | ) | |

**MEMORIAL HOSPITAL ASSOCIATION'S ANSWER TO PLAINTIFF'S COMPLAINT**

Memorial Hospital Association submits the following answer and affirmative defenses to Plaintiff's Complaint:

**INTRODUCTION**

1. Plaintiff brings this class action to address Defendant's improper practice of disclosing the confidential Personally Identifying Information ("PII")[1] and/or Protected Health Information ("PHI")[2] (collectively referred to as "Private Information") of Plaintiff and the proposed

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM.

Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"),[3] and potentially others ("the Disclosure") via tracking technologies used on its website.

**ANSWER:** Denied.

2. The Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") and the Federal Trade Commission ("FTC") warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites or online platforms, such as Defendant's, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[4] OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[5] OCR and FTC warn that "[i]mpermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental

---

SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). Memorial Hospital is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

[3] Facebook changed its name from Facebook, Inc. to Meta Platforms, Inc. in October 2021. Plaintiff's reference to both "Facebook" and "Meta" throughout this complaint refer to the same company.

[4] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm source=govdelivery.

[5] *Id.*

anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."[6]

**ANSWER:** Defendant admits that Plaintiff's complaint quotes a portion of websites, but denies that the websites are admissible, denies that the complaint fully and accurately characterizes those websites and denies that this case involves any information referenced in those websites. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

3. Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

4. Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider may disclose a person's personally identifiable protected health information to a third party without express written authorization.

[6] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf ), **attached as Exhibit A to Plaintiff's Complaint.**

**ANSWER:** Defendant admits that the Health Insurance Portability and Accountability Act of 1996, and the Privacy Rule exist. Defendant denies any allegations about the Health Insurance Portability and Accountability Act of 1996, and the Privacy Rule that are inconsistent with their plain terms, or that it violated the Health Insurance Portability and Accountability Act of 1996, and/or the Privacy Rule. Defendant denies the remaining allegations.

5. In December 2022, HHS released a bulletin on its website regarding the use of tracking technologies by entities covered by HIPAA—healthcare entities like Memorial Hospital —and its business associates (the "December 2022 Bulletin").[7]

**ANSWER:** Defendant admits that Plaintiff purports to cite a bulletin. Defendant denies that the website and the contents of that bulletin apply to this case and deny the remaining allegations in this paragraph.

6. Therein, HHS defined tracking technologies, explaining:

Tracking technologies are used to collect and analyze information about how users interact with regulated entities' websites or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors.[8]

**ANSWER:** Defendant admits that Plaintiff purports to cite a website. Defendant denies any allegations about the website that are inconsistent with its plain terms. Defendant denies that the website and the contents therein apply to this case and deny the remaining allegations in this paragraph.

[7] *See* archived version of the December 2022 Bulletin at *HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information*, HHS.gov (Dec. 1, 2022), https://web.archive.org/web/20221201192812/https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 30, 2024).

[8] *Id*.

7. In the Bulletin, HHS was clear in unambiguous terms that, "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[9],[10]

**ANSWER:** Defendant admits that Plaintiff purports to cite a website. Defendant denies any allegations about the bulletin that are inconsistent with their plain terms. Defendant denies that the website and the contents therein apply to this case and deny the remaining allegations in this paragraph.

8. On March 18, 2024, HHS updated its December 2022 bulletin, "to increase clarity for regulated entities and the public" and reiterating the above basic privacy obligations.[11],[12]

**ANSWER:** Defendant admits that Plaintiff purports to cite a website. Defendant denies any allegations about the bulletin that are inconsistent with their plain terms. Defendant denies that the website and the contents therein apply to this case and deny the remaining allegations in this paragraph.

9. Memorial Hospital is an independent nonprofit hospital and health care network located in Hancock County. Its services include "a 24/7 emergency room (with almost 4,000 visits a year), surgical procedures, medical imaging technology, and several community clinics."[13]

**ANSWER:** Admitted.

---

[9] *Id*. (bold emphasis in original)
[10] Citing *to* 45 CFR 164.508(a)(3); s*ee also* 45 CFR 164.501 (definition of "Marketing").
[11] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022, updated Mar. 18, 2024), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html
[12] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.*, Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.
[13] About Us, Memorial Hospital, https://www.mhtlc.org/about/

10. Despite its unique position as a massive and trusted healthcare provider, Memorial Hospital knowingly configured and implemented into its website, www.mhtlc.org (the "Website") code-based tracking devices known as "trackers" or "tracking technologies," which collected and transmitted Plaintiff and Class Members' Private Information to Facebook, Google, and other third parties, without Plaintiff and Class Members' knowledge or authorization.

**ANSWER:** Denied.

11. Defendant encourages patients to use its Website, along with its various web-based tools and services (collectively, the "Online Platforms"), to search for physicians, locate healthcare facilities, learn about specific health conditions and treatment options, pay bills, sign up for classes and events, and more. Plaintiff and the Class Members visited Defendant's Online Platforms in relation to their past, present, and future health, healthcare and/or payment for health care.

**ANSWER:** Denied.

12. When Plaintiff and Class Members used Defendant's Website and Online Platforms, they thought they were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendant embedded pixels from Facebook, Google, DoubleClick, Simpli.fi, AppNexus, Microsoft Clarity, and others into its Website and Online Platforms, surreptitiously forcing Plaintiff and Class Members to transmit intimate details about their medical treatment to third parties without their consent.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of allegations relating to what the Plaintiff and purported Class Members thought. Defendant denies all remaining allegations.

13. A tracker (also referred to as "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.[14] When a person

[14] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/

visits a website with an tracker, it tracks "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[15] Then, the tracker transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.[16]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

14. Among the trackers Defendant embedded into its Website is the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"). By default, the Meta Pixel tracks information about a website user's device and the URLs and domains they visit.[17] When configured to do so, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.[18] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.[19]

**ANSWER:** Defendant admits that a "Meta Pixel" was installed on its public facing website, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations.

15. Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiff and Class Members' private health information, alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant

---

[15] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking

[16] *Id.*

[17] *See* Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started

[18] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[19] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/

effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook without their authorization or knowledge.

**ANSWER:** Denied.

16. Facebook encourages and recommends use of its Conversions Application Programming Interface ("CAPI") alongside use of the Meta Pixel.[20]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

17. Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interactions from the website owner's private servers, which transmits the data directly to Facebook, without involvement from the website user's browser.[21], [22]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

18. Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from sending website users' Private Information to Facebook directly. For this reason, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full

---

[20] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/

[21] What is the Facebook Conversion API and How to Use It, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/

[22] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel.... This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." Conversions API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api

journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[23]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

19. Defendant utilized data from these trackers to market its services and bolster its profits. Facebook utilizes data from the Meta Pixel and CAPI to build data profiles for the purpose of creating targeted online advertisements and enhanced marketing services, which it sells for profit.

**ANSWER:** Defendant denies that it utilized data from these trackers to market its services and bolster its profits. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations.

20. The information that Defendant's Meta Pixel and CAPI sent to Facebook included Private Information that Plaintiff and Class Members submitted to Defendant's Website contained in the terms they searched, the pages they visited, and the buttons that they clicked.

**ANSWER:** Denied.

21. Such information allows third parties (e.g., Facebook) to learn an individual's health conditions and the medical care he or she seeks.. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers, who then target Plaintiff and Class Members with online advertisements, based on the information they communicated to Defendant via the Website. Facebook and any third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of any allegations about what Facebook and any third-party

[23] About Conversions API, META FOR DEVELOPERS, https://www.facebook.com/business/help/2041148702652965

purchasers of Plaintiff's and Class Members' Private Information could reasonably infer. Defendant denies all remaining allegations.

22. In addition to the Facebook Pixel, and likely CAPI, on information and belief, Defendant installed other tracking technologies, Facebook, Google, DoubleClick, Simpli.fi, AppNexus, and Microsoft Clarity, which operate similarly to the Meta Pixel and transmitted Plaintiff's and Class Members' Private Information to unauthorized third parties.

**ANSWER:** Denied.

23. Healthcare patients simply do not anticipate that their trusted healthcare provider will send their private health information to a hidden third party—let alone Facebook, a company with a sordid history of violating consumer privacy in pursuit of ever-increasing advertising revenue.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

24. Neither Plaintiff nor any Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or any other third parties uninvolved in their treatment.

**ANSWER:** Denied.

25. Despite willfully and intentionally incorporating the Meta Pixel, potentially CAPI, and other third-party trackers into its Website and servers, Memorial Hospital did not disclose to Plaintiff or Class Members that it was sharing their sensitive and confidential communications and Private Information with third parties including Facebook, Google, DoubleClick, Simpli.fi, AppNexus, and Microsoft Clarity.

**ANSWER:** Denied.

26. Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant.

**ANSWER:** Denied.

27. Defendant owed common law, statutory, and regulatory duties to keep Plaintiff's and Class Members' communications and Private Information safe, secure, and confidential.

**ANSWER:** Denied.

28. Upon information and belief, Memorial Hospital utilized the Meta Pixel and other tracker data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.

**ANSWER:** Denied.

29. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard their information from unauthorized disclosure.

**ANSWER:** Denied.

30. Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, *inter alia*: (i) failing to adequately review its marketing programs and web-based technology to ensure its Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share patient information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook and others; (v) failing to protect Private Information and take steps to block the transmission of Plaintiff's and Class Members' Private Information through the use of Meta Pixel and other tracking technology; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise

failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

**ANSWER:** Denied.

31. Plaintiff seeks to remedy these harms and bring causes of action for (I) Negligence; (II) Negligence *Per Se*; (III) Breach of Express Contract; (IV) Breach of Implied Contract; (V) Unjust Enrichment; (VI) Bailment; (VII) Violation of the Illinois Eavesdropping Statute, 720 Ill. Comp. Stat. 5/14, *et seq*.; (VIII) Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), *et seq.;* (IX) Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(3)(a) ("Unauthorized Divulgence By Electronic Communications Service"); (X) Violation of Title II of the Electronic Communications Privacy Act, 18 U.S.C. § 2702, *et seq*.; and (XI) Violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*

**ANSWER:** Denied.

## PARTIES

32. Plaintiff, Lacey Gittings-Barrera, is a natural person and a resident and citizen of Illinois, where she intends to remain, with a principal residence in La Harpe, Hancock County. She is a patient of Memorial Hospital and a victim of Defendant's unauthorized Disclosure of Private Information.

**ANSWER:** Defendant admits that Plaintiff is a natural person and resident of Illinois. Defendant lacks knowledge or information sufficient to form a belief about the truth of any allegations about her principal residence and intent to remain in Hancock County. Defendant denies all remaining allegations.

33. Defendant Memorial Hospital Association d/b/a Memorial Hospital ("Memorial Hospital" or "Defendant"), is a non-profit independent healthcare corporation organized and existing under the laws of the State of Illinois with its principal place of business at 1454 North County Road 2050, Carthage, Illinois, 62321.

**ANSWER:** Admitted.

## JURISDICTION AND VENUE

34. This Court has subject matter jurisdiction over the subject matter over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States and under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class and at least one member of the class is a citizen of a state different from Defendant.

**ANSWER:** Denied.

35. This Court has personal jurisdiction over Defendant because its principal place of business is in this District and a substantial portion of the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

**ANSWER:** Defendant admits that its principal place of business is within this District. It denies all remaining allegations.

36. Venue is proper in this judicial district under 28 U.S.C. § 1391 (a) through (d) because: (i) a substantial part of the events giving rise to this action occurred in this judicial district including decisions made by Defendant's governance and management personnel or inaction by those individuals that led to the Disclosure of Plaintiff's and Class members' Private Information; (ii) Defendant's principal place of business is located in this judicial district; (iii) Defendant collects and redistributes Class members' Private Information in this judicial district and (iv) Defendant caused harm to Class members residing in this judicial district.

**ANSWER:** Denied.

## COMMON FACTUAL ALLEGATIONS

### A. Background

37. Memorial Hospital, headquartered in Carthage, Illinois, is an independent nonprofit Critical Access Hospital[24] governed by a Board of Directors.

**ANSWER:** Admitted.

38. Memorial Hospital claims that it "includes the 21st Century technology so critical to patient care while reflecting the values and dedication to community that helped the original hospital open its doors in 1950."[25] "It is currently the second largest employer in Hancock County, with an annual payroll of 15 million."[26]

**ANSWER:** Defendant admis that this paragraph quotes of out context Defendant's website. Defendant denies any allegations about the website inconsistent with its express terms.

39. "Services available at Memorial Hospital include a 24/7 emergency room (with over 4500 visits per year) surgical procedures, medical imaging, OB deliveries, and several community clinics."[27]

**ANSWER:** Defendant admis that this paragraph quotes of out context Defendant's website. Defendant denies any allegations about the website inconsistent with its express terms.

40. Memorial Hospital serves many of its patients via its Website and Online Platforms, which it encourages patients to use to find a physician,[28] research treatment options,[29] find treatment locations,[30] access the patient portal,[31] pay bills,[32] contact Memorial Hospital,[33] and more. It promotes

---

[24] For information on "Critical Access Hospital" designation, see https://www.cms.gov/medicare/health-safety-standards/certification-compliance/critical-access-hospitals
[25] Hancock County Health Dept., Memorial Hospital Community Health Needs Assessment (2021-2024) https://www.mhtlc.org/wp-content/uploads/2022/03/2021CHNAFinalDocument10271.pdf
[26] *Id.*
[27] *Id.*
[28] Find a Provider, Memorial Hospital, https://www.mhtlc.org/patients-visitors/providers/
[29] Services, Memorial Hospital, https://www.mhtlc.org/services/
[30] Clinics, Memorial Hospital, https://www.mhtlc.org/clinics/
[31] My UnityPoint, https://chart.myunitypoint.org/mychart/Authentication/Login?
[32] Bill Pay, Memorial Hospital, https://www.mhtlc.org/utility/bill-pay/
[33] Contact Us, Memorial Hospital, https://www.mhtlc.org/utility/contact-us/

the comprehensive functionality of these tools and promotes their use, in service of its own goal of increasing profitability.

**ANSWER:** Defendant admits that it maintains a website. Defendant denies any allegations about the website inconsistent with its express terms. Defendant denies all remaining allegations.

41. To enhance its marketing efforts and increase profits, Defendant purposely installed the Meta Pixel and other trackers onto its Website to gather Private Information about Plaintiff and Class Members. But Defendant did not only generate information for its own use: it also shared patient Private Information, including that belonging to Plaintiff and Class Members, with Facebook, Google, DoubleClick, Simpli.fi, AppNexus, and Microsoft Clarity, and potentially other unauthorized third parties.

**ANSWER:** Denied.

42. To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows.

**ANSWER:** Denied.

***i. Facebook's Business Tools and the Meta Pixel***

43. Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[34]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

[34] Meta Reports Fourth Quarter and Full Year 2021 Results, FACEBOOK https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022).

44. In conjunction with its advertising business, Facebook encourages website owners like Defendant to use its "Business Tools" to gather customer data, identify customers and potential customers, and market products and services.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

45. Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

46. The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, clicks a button, fills out a form, and more.[35] Businesses that want to target customers and advertise their services can also create their own tracking parameters by building a "custom event."[36]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

47. One such Business Tool is the Meta Pixel, a tool that "tracks the people and type of actions they take."[37] When an individual accesses a webpage that is hosting the Meta Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent

---

[35] Specifications for Facebook Pixel Standard Events, META, https://www.facebook.com/business/help/402791146561655; *see also* Facebook Pixel, Accurate Event Tracking, Advanced, META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* Best Practices for Facebook Pixel Setup, META https://www.facebook.com/business/help/218844828315224; App Events API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/

[36] About Standard and Custom Website Events, META, https://www.facebook.com/business/help/964258670337005; *see also* Facebook, App Events API, *supra*.

[37] Retargeting, META, https://www.facebook.com/business/goals/retargeting.

to Facebook—traveling directly from the user's browser to Facebook's server, based off instructions from the Meta Pixel.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

48. Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy, such as a homepage, and disable it on pages that do implicate patient privacy.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

49. The Meta Pixel's primary purpose is to enhance online marketing, improve online ad targeting, and generate sales.[38].

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

50. Facebook's own website informs companies that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[39]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

51. According to Facebook, the Meta Pixel can collect the following data.

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and ***person using the website.*** [Emphasis added.]

**Pixel-specific Data –** Includes Pixel ID and the Facebook Cookie.

**Button Click Data –** Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

---

[38] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/
[39] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153

**Optional Values –** Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names –** Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[40]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

52. Facebook boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your website.
- **Drive more sales**. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.
- **Measure the results of your ads.** Better understand the impact of your ads by measuring what happens when people see them.[41]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

53. Facebook likewise benefits from Meta Pixel data and uses it to enhance its own ad targeting abilities.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

***ii. Defendant's method of transmitting Plaintiff's and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Meta Pixel***

54. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g.,

---

[40] Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/
[41] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153

Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

55. Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

56. Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[42]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

57. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

58. When an individual visits a website, their web browser sends an HTTP Request to the entity's servers that essentially asks the website to retrieve certain information. The entity's servers send the HTTP Response, which contains the requested information in the form of

---

[42] "Cookies are small files of information that a web server generates and sends to a web browser . . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/

"Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

59. Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

60. Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

61. In this way, the Meta Pixel acts much like a traditional wiretap, intercepting and transmitting communications intended only for the website host and diverting them to Facebook.

**ANSWER:** Denied.

62. Separate from the Meta Pixel, Facebook and other third parties place cookies in the web browsers of users who visit their websites or online platforms. These cookies can uniquely identify the user, allowing the third party to track the user as they browse the internet—on the third-party site and beyond. Facebook uses its own cookie to identify users of a Meta-Pixel-enabled website and connect their activities on that site to their individual identity. As a result, when a Facebook account holder uses a website with the Meta Pixel, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the user associated with the information it has intercepted.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

63. With substantial work and technical know-how, internet users can sometimes circumvent these browser-based wiretap technologies. To counteract this, third parties bent on gathering data implement workarounds that are difficult for web users to detect or evade. Facebook's workaround is Conversions API, which "is designed to create a direct connection between [web hosts'] marketing data and [Facebook]."[43] This makes Conversions API a particularly effective tool because it allows sends Facebook data directly from the website server to Facebook, without relying on the user's web browser. Notably, client devices do not have access to host servers containing Conversions API, and thus, they cannot prevent (or even detect) this transmission of information to Facebook.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

64. While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the website server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website events [with Facebook] that the pixel may lose."[44] Consequently, if a website owner utilizes the Meta Pixel on its website, it is also reasonable to infer that it implemented the Conversions API on its website server(s), in accordance with Facebook's documentation.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

---

[43] About Conversions API, META, https://www.facebook.com/business/help/2041148702652965

[44] *See* Best Practices for Conversions API, META, https://www.facebook.com/business/help/308855623839366

65. The Meta Pixel, Conversions API, and other third-party trackers do not provide any substantive content on the host website. Rather, their only purpose is to collect information to be used for marketing and sales purposes.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

66. Accordingly, without any knowledge, authorization, or action by a user, a website owner can use its website source code to commandeer its users' computing devices and web browsers, causing them to invisibly re-direct the users' communications to Facebook, Google, or others.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations. Defendant denies that it engaged in the conduct alleged in this paragraph.

67. In this case, Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

**ANSWER:** Denied.

68. Consequently, when Plaintiff and Class Members visited Defendant's Website and communicated their Private Information, it was simultaneously intercepted and transmitted to Facebook.

**ANSWER:** Denied.

***iii. Defendant Violated its own Privacy Policies***

69. Memorial Hospital's "Privacy Statement"[45] and "Patient Rights and Responsibilities" statement[46] (collectively referred to as the "Privacy Policies") are posted and maintained on its Website.

**ANSWER:** Defendant admits that it maintains a Privacy Statement and Patient Rights and Responsibilities statement on its website. Defendant denies any allegations about the Privacy Statement and Patient Rights and Responsibilities statement inconsistent with their express terms. Defendant denies all remaining allegations.

70. Defendant's Privacy Statement provides, "[t]his notice describes how medical information about you may be used and disclosed and how you can get access to this information."[47]

**ANSWER:** Defendant admits that it maintains a Privacy Statement and Patient Rights and Responsibilities statement on its website. Defendant admits that this allegation quotes a portion of the former. Defendant denies any allegations about the Privacy Statement and Patient Rights and Responsibilities statement inconsistent with their express terms, including that this paragraph fully or accurate reflects the Privacy Statement and Patient Rights and Responsibilities statement. Defendant denies all remaining allegations.

71. Memorial Hospital's Privacy Statement goes on to promise:

**OUR PLEDGE REGARDING MEDICAL INFORMATION:**

We understand that medical information about you and your health is personal. We are committed to protecting medical information about you. We create a record of the care and services you receive at the hospital, nursing home and all covered entities. We need this record to provide you with quality care and to comply with certain legal requirements. This notice applies to all of the records of your care or services generated by the hospital, nursing home and all covered entities, whether made by the hospital, nursing home or a covered entity's personnel or your personal provider.

**OUR LEGAL DUTY**

---

[45] Privacy Statement, Memorial Hospital, https://www.mhtlc.org/utility/privacy-statement/ (attached as **Exhibit B to Plaintiff's Complaint**).

[46] Patient Rights and Responsibilities, Memorial Hospital, https://www.mhtlc.org/utility/patients-rights-responsibilities/ (attached as **Exhibit C to Plaintiff's Complaint**).

[47] **Exhibit B (attached to Plaintiff's Complaint)**, Privacy Statement, *supra*.

> We are required by law to protect and maintain the privacy of your health information, to provide this notice about our legal duties and privacy practices regarding protected health information, and to abide by the terms of the notice currently in effect.

**ANSWER:** Defendant admits that it maintains a Privacy Statement and Patient Rights and Responsibilities statement on its website. Defendant admits that this allegation quotes a portion of the former. Defendant denies any allegations about the Privacy Statement and Patient Rights and Responsibilities statement inconsistent with their express terms, including that this paragraph fully or accurate reflects the Privacy Statement and Patient Rights and Responsibilities statement. Defendant denies all remaining allegations.

72. The Privacy Statement further acknowledges that there are limited ways Memorial Hospital is permitted to use and disclose PHI, such as for treatment, payment, and healthcare operations.[48]

**ANSWER:** Defendant admits that it maintains a Privacy Statement and Patient Rights and Responsibilities statement on its website. Defendant admits that this allegation quotes a portion of the former. Defendant denies any allegations about the Privacy Statement and Patient Rights and Responsibilities statement inconsistent with their express terms, including that this paragraph fully or accurate reflects the Privacy Statement and Patient Rights and Responsibilities statement. Defendant denies all remaining allegations.

73. Notably, the Privacy Statement says Memorial Hospital **"**may use and disclose medical information about you on a limited basis for marketing."[49] The Privacy Statement enumerates two specific such ways:

- Face to face communication with an individual. An example of this would be when sample products are provided to a patient during an office or clinic visit.
- An individual is given a promotional gift of nominal value. An example would be when a provider distributes pens or key chains with the name of the covered entity.[50]

**ANSWER:** Defendant admits that it maintains a Privacy Statement and Patient Rights and Responsibilities statement on its website. Defendant admits that this

---

[48] *Id.*
[49] *Id.*
[50] *Id.*

allegation quotes a portion of the former. Defendant denies any allegations about the Privacy Statement and Patient Rights and Responsibilities statement inconsistent with their express terms, including that this paragraph fully or accurate reflects the Privacy Statement and Patient Rights and Responsibilities statement. Defendant denies all remaining allegations.

74. The Privacy Statement then states, "[o]ther uses and disclosures of medical information not covered by this notice or the laws that apply to us will be made only with your written permission."[51]

**ANSWER:** Defendant admits that it maintains a Privacy Statement and Patient Rights and Responsibilities statement on its website. Defendant admits that this allegation quotes a portion of the former. Defendant denies any allegations about the Privacy Statement and Patient Rights and Responsibilities statement inconsistent with their express terms, including that this paragraph fully or accurate reflects the Privacy Statement and Patient Rights and Responsibilities statement. Defendant denies all remaining allegations.

75. Further, Memorial Hospital's Patient Rights & Responsibilities recognizes that patients have the right to "privacy and confidentiality as they relate to you and your medical records."[52]

**ANSWER:** Defendant admits that it maintains a Privacy Statement and Patient Rights and Responsibilities statement on its website. Defendant admits that this allegation quotes a portion of the latter. Defendant denies any allegations about the Privacy Statement and Patient Rights and Responsibilities statement inconsistent with their express terms, including that this paragraph fully or accurate reflects the Privacy Statement and Patient Rights and Responsibilities statement. Defendant denies all remaining allegations.

76. Nowhere in the Privacy Statement or anywhere else on the Website does Memorial Hospital disclose its use of the Meta Pixel or other tracking technologies, which disclosed information about Plaintiff and Class Members to unauthorized third parties and for marketing purposes.

---

[51] *Id.*
[52] **Exhibit C to Plaintiff's Complaint**, Patient Rights and Responsibilities, Memorial Hospital, https://www.mhtlc.org/utility/patients-rights-responsibilities/

**ANSWER:** Defendant admits that it maintains a Privacy Statement and Patient Rights and Responsibilities statement on its website. Defendant admits that this allegation quotes a portion of the latter. Defendant denies any allegations about the Privacy Statement and Patient Rights and Responsibilities statement inconsistent with their express terms, including that this paragraph fully or accurate reflects the Privacy Statement and Patient Rights and Responsibilities statement. Defendant denies all remaining allegations.

77. Despite these representations in its Privacy Policy, Defendant did, in fact, use Plaintiff's and Class Members' Private Information for marketing purposes without Plaintiff's and Class Members' signed authorization.

**ANSWER:** Defendant admits that it maintains a Privacy Statement on its website. Defendant denies any allegations about the Privacy Statement inconsistent with its express terms, including that this paragraph fully or accurate reflects the Privacy Statement. Defendant denies all remaining allegations.

78. Furthermore, Memorial Hospital provided Plaintiff and Class Members' Private Information to third parties, including Facebook and Google, in exchange for valuable consideration, such as enhanced marketing services.

**ANSWER:** Denied.

79. Through its use of the Meta Pixel, Memorial Hospital disclosed to Facebook Plaintiff and Class Members' Private Information, communicated via its Website, including the content they viewed, the buttons they clicked, the terms they searched, and the parameters of their doctor's searches.

**ANSWER:** Denied.

80. Defendant had the Meta Pixel installed on its Website from at least November 29, 2017, through at least December 29, 2023.

**ANSWER:** Defendant admits that a "Meta Pixel" was installed on its public facing website, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations.

81. As soon as Plaintiff and Class Members arrived at the Website homepage, Defendant informed Facebook, via the Meta Pixel, that the individual was on a page titled "About Us - Memorial Hospital, Carthage IL," at the URL www.mhtlc.org.

**ANSWER:** Denied.

82. As Plaintiff and Class Members continued to navigate beyond the homepage, Memorial Hospital tracked and disclosed to Facebook (i) the keywords Plaintiff and Class Members searched using the Website's general search bar; (ii) the parameters of their physician searches; (iii) the content they viewed, including information about particular health conditions and/or services, same-day appointments with Defendant, and treatment locations; and (iv) their accessing of patient-specific resources, such as bill pay and financial assistance.

**ANSWER:** Denied.

Memorial Hospital Shared Patients' Keyword Searches

83. When Plaintiff and Class Members used the Website's search function, Defendant revealed to Facebook the keywords they searched and the results they selected and viewed. For instance, when a patient searched the Website for the keyword "cancer," Defendant reported to Facebook that the individual conducted a search for "s=cancer." Then, when a patient clicked one of the search results, to view more information about oncology services, Defendant informed Facebook that the individual had looked at information about a "services/specialty/oncology" after conducting search for "s=cancer," as shown below:

**ANSWER:** Because this allegation is entirely hypothetical, Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.




<u>Memorial Hospital Shared Patients' Provider Searches</u>

84. Defendant also divulged information about Plaintiff and Class Members' physician searches to Facebook. As soon as a patient navigated to the Website's Find a Physician page, Defendant reported this event to Facebook, disclosing that the patient was viewing a page with the title "Providers Archive - Memorial Hospital, Carthage, IL" at the URL www.mbhtlc.org/patients-

visitors/providers. Next, as the patient selected a doctor with a particular specialty and/or in a particular location—for example, a doctor specializing in cardiology and practicing at Memorial Medical Clinic in Carthage—Defendant disclosed to Facebook the details of that search (e.g., that the patient searched under "providers" for "providers specialty=cardiology-heart" and "location=memorial-medical-clinic-carthage"). Additionally, if the patient searched for a physician by name (e.g., "Michael Veeder"), Defendant also disclosed this information ("s=Michael+Veeder") to Facebook.

**ANSWER:** Because this allegation is entirely hypothetical, Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

Memorial Hospital Shared Patients' Searches for Locations and Services

85. Memorial Hospital revealed to Facebook the clinic locations and particular health care services that Plaintiff and Class Members sought out. For instance, when the patient clicked to learn more about the Carthage clinic from the Website's Clinics page, Memorial Hospital informed Facebook that the individual navigated to view "clinics/carthage." Then, when a patient opened a page to learn more about "Convenient Care," a program for same-day appointments offered at the Carthage Clinic, Defendant reported this event to Facebook.

**ANSWER:** Because this allegation is entirely hypothetical, Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

86. Likewise, Defendant shared with Facebook the health care services that Plaintiff and Class Members viewed and interacted with on Website. As soon as Plaintiff and Class Members loaded the Services page, Defendant sent a report to Facebook that the individual was on the page entitled "Services - Memorial Hospital, Carthage, IL," where one could find "treatments and services available here." As the patient clicked to load information about a specific services, such as surgical and gynecological surgical services, Defendant reported that the patient

had navigated from the "services" page to view "services/surgery" and then "services/surgery/gynecology."

**ANSWER:** Because this allegation is entirely hypothetical, Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

Memorial Hospital Shared Patients' Bill Pay Related Activities

87. Similarly, Defendant informed Facebook whenever Plaintiff or Class Members viewed Website information relevant only to patients. For instance, when a patient loaded the Patient Charges & Costs page, Memorial Hospital revealed that the patient was on a page about "patients/visitors/charges/." Next, as the patient navigated to view a page about financial assistance offered to patients, Memorial Hospital also shared this information with Facebook, revealing that the individual navigated to a page about "financial-assistance." Finally, as the patient loaded a page to pay bills online, Defendant reported that the individual navigated to a page about "bill-pay" from the "financial-assistance" page.

**ANSWER:** Because this allegation is entirely hypothetical, Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

88. In each of the transmitted Meta Pixel events, Defendant included the "c_user" cookie, which Facebook uses to identify users. Furthermore, Facebook's "Your activity off Meta technologies" report confirms that Facebook received the data Memorial Hospital shared with Facebook.

**ANSWER:** Because this allegation is entirely hypothetical, Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

89. In addition to this information, Defendant's Meta Pixel collected and transmitted to Facebook identifying information, including the patient's IP address, browser and device information, and location. Combined with information about Plaintiff and Class Members' specific medical conditions and treatments, this information constitutes Private Information, or PHI.

**ANSWER:** Defendant denies that it shared "Private Information" (as defined in the complaint) or PHI. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations.

90. After receiving this information from Defendant, Facebook processed it, analyzed it, and assimilated it into its own massive datasets, before selling access to this data in the form of targeted advertisements.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

91. Employing "Audiences"—subsections of individuals identified as sharing common traits—Facebook promises advertisers the ability to "find the people most likely to respond to your ad."[53] Advertisers can purchase the ability to target their ads based on a variety of criteria: "Core Audiences," individuals who share a location, age, gender, and/or language;[54] "Custom Audiences," individuals who have taken a certain action, such as visiting a website, using an app, or buying a product bought a product;[55] and/or "Lookalike Audiences," groups of individuals who "resemble" a Custom Audience, and who, as Facebook promises, "are likely to be interested in your business because they're similar to your best existing customers.[56]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

92. Google and other companies process data in a similar manner and use it to build marketing and other data profiles allowing for targeted online advertising.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

---

[53] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting

[54] *Id.*

[55] *Id.*

[56] How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Help Center, https://www.facebook.com/business/help/465262276878947

93. Defendant could have chosen not to use the Meta Pixel, or it could have configured it to limit the information that it communicated to Facebook, but it did not. Instead, it intentionally selected and took advantage of the features and functionality of the Pixel that resulted in the Disclosure of Plaintiff and Class Members' Private Information.

**ANSWER:** Denied.

94. Along those same lines, Defendant could have chosen not to use Google Analytics with Google Tag Manager, DoubleClick Ads, Simpli.fi, Facebook Events, Adnxs.com by AppNexus, and Microsoft Clarity to track Plaintiff and Class Members private communications and transmit that information to unauthorized third parties. It did so anyway, intentionally taking advantage of these trackers despite the harm to Plaintiff and Class Members' privacy.

**ANSWER:** Denied.

95. Defendant used and disclosed Plaintiff and Class Members' Private Information to Facebook, Google, DoubleClick, Simpli.fi, AppNexus, and Microsoft Clarity for the purpose of marketing its services and increasing its profits.

**ANSWER:** Denied.

96. On information and belief, Defendant shared, traded, or sold Plaintiff and Class Members' Private Information with Facebook, Google, DoubleClick, Simpli.fi, AppNexus, and Microsoft Clarity in exchange for improved targeting and marketing services.

**ANSWER:** Denied.

97. Plaintiff did not consent, agree, authorize, or otherwise permit Defendant to disclose their Private Information for marketing purposes. Defendant did not notify Plaintiff and Class Members of their practice of disclosing patients' Private Information to Facebook, Google, DoubleClick, Simpli.fi, AppNexus, and Microsoft; nor did Defendant provide any means of opting out of these disclosures. Defendant, nonetheless, used Plaintiff and Class Members' Private

Information and knowingly disclosed that Private Information to unauthorized entities for Defendant's own gain.

**ANSWER:** Denied.

98. Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

99. Defendant misrepresented that it would preserve the security and privacy of Plaintiff and Class Members' Private Information while knowingly disclosing their Private Information to unauthorized third parties.

**ANSWER:** Denied.

100. By law, Plaintiff and the Class Members are entitled to privacy in their Private Information and confidential communications. Memorial Hospital deprived Plaintiff and Class Members of their privacy rights when it (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff and Class Members' confidential communications, Personally Identifiable Information, and Protected Health Information; (2) disclosed patients' Private Information to unauthorized, third-party eavesdroppers, including Facebook, Google, DoubleClick, Simpli.fi, AppNexus, and Microsoft; (3) profited from the Disclosure; and (4) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

**ANSWER:** Denied.

**B. Plaintiff's Experience**

101. Plaintiff Lacey Gittings-Barrera has been a patient of Defendant since 2009. She has received treatment from Memorial Hospital and physicians in Memorial Hospital's network.

**ANSWER:** Admitted.

102. Ms. Gittings-Barrera relied on Memorial Hospital's Website and Online Platforms to communicate confidential patient information. Ms. Gittings-Barrera began using the Website and Online Platforms in 2009. She uses the Website approximately five to ten times a year. Ms. Gittings-Barrera has used the Website and Online Platforms to search for physicians, schedule appointments, and access the patient portal.

**ANSWER:** Defendant denies that Plaintiff relied on Memorial Hospital's Website and Online Platforms to communicate confidential patient information. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations.

103. Ms. Gittings-Barrera accessed Defendant's Website and Online Platforms at Defendant's direction and encouragement. Ms. Gittings-Barrera reasonably expected that her online communications with Memorial Hospital were confidential, solely between herself and Memorial Hospital, and that, as such, those communications would not be transmitted to or intercepted by a third party.

**ANSWER:** Denied.

104. Ms. Gittings-Barrera provided her Private Information to Defendant and trusted that the information would be safeguarded according to Memorial Hospital's privacy policies and the law.

**ANSWER:** Denied.

105. Through its use of the Meta Pixel, Defendant disclosed to Facebook a. Ms. Gittings-Barrera's identity;

b. Ms. Gittings-Barrera's status as a patient of Defendant;

c. Ms. Gittings-Barrera's seeking of medical treatment from Defendant;

d. Ms. Gittings-Barrera's health conditions and the treatment she sought; and

e. Ms. Gittings-Barrera's location.

**ANSWER:** Denied.

106. By failing to receive the requisite consent to disclose Ms. Gittings-Barrera's Private Information, Memorial Hospital violated its agreements with Ms. Gittings-Barrera, its own policies, and the law.

**ANSWER:** Denied.

107. Since using Defendant's Website, Ms. Gittings-Barrera has been targeted by health-related online advertisements including ads for anti-depressant medications and products and services related to depression and anxiety.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

108. Plaintiff paid for Defendant's healthcare services, which included reasonable privacy and data security protections for Ms. Gittings-Barrera's Private Information; however, Ms. Gittings-Barrera did not receive the privacy and security protections for which she paid.

**ANSWER:** Denied.

109. As described herein, by use of the Meta Pixel and tracking technology, Memorial Hospital sent Plaintiff's Private Information to Facebook and others when she used Defendant's Online Platforms to communicate healthcare and identifying information to Memorial Hospital.

**ANSWER:** Denied.

110. Ms. Gittings-Barrera first discovered that Defendant was using the Meta Pixel and other tracking technologies to gather and disclose her Private Information in October 2023.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

111. Pursuant to the process described herein, Memorial Hospital assisted Facebook and others with intercepting Plaintiff's confidential communications, including those that contained PII and PHI. Memorial Hospital facilitated these interceptions without Plaintiff's knowledge, consent, or express written authorization.

**ANSWER:** Denied.

112. Plaintiff never intended to sell her Private Information or would have permitted it to be made available for sale on the resale market.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

113. On information and belief, through its use of the Meta Pixel and other tracking technologies, Memorial Hospital disclosed to Facebook:

a. The pages and content Plaintiff viewed;

b. Plaintiff's seeking of medical treatment;

c. Plaintiff's status as a patient;

d. Information regarding Plaintiff's patient portal activity;

e. The specialties of the medical providers Plaintiff searched for and viewed;

f. the names of the medical providers Plaintiff searched for and viewed;

g. the search results that Plaintiff clicked on;

h. the medical services Plaintiff viewed; and,

i. Plaintiff's identity via her IP address and/or "c_user" cookie and/or Facebook ID.

**ANSWER:** Denied.

114. By failing to receive the requisite consent, Memorial Hospital breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

**ANSWER:** Denied.

115. As a result of Memorial Hospital's Disclosure of Plaintiff's Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Plaintiff has suffered the following injuries:

a. Loss of privacy; unauthorized disclosure of her Private Information; unauthorized access of her Private Information by third parties;

b. Plaintiff now receives targeted health-related advertisements on Facebook, reflecting her private medical treatment information;

c. Plaintiff paid Memorial Hospital for medical services and the services she paid for included reasonable privacy and data security protections for her Private Information, but Plaintiff did not receive the privacy and security protections for which she paid, due to Defendant's Disclosure;

d. The portion of Memorial Hospital's revenues and profits attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;

e. The portion of Memorial Hospital's savings in marketing costs attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;

f. The portion of Memorial Hospital's revenues and profits attributable to serving and monetizing advertisements directed to Plaintiff as a result of collecting Plaintiff's Private Information without authorization and sharing it with third parties;

g. Value to Plaintiff of surrendering her choice to keep her Private Information private and allowing Memorial Hospital to track her data. ;

h. Embarrassment, humiliation, frustration, and emotional distress;

i. Decreased value of Plaintiff's Private Information;

j. Lost benefit of the bargain;

k. Increased risk of future harm resulting from future use and disclosure of her Private Information; and

l. Statutory damages.

**ANSWER:** Denied.

**C. Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of PHI**

116. In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[57] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

117. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective . . . at preventing the receipt of sensitive data."[58]

---

[57] Kurt Wagner & Bloomberg, Facebook Admits Another Blunder with User Data, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.

[58] New York State Department of Financial Services, REPORT ON INVESTIGATION OF FACEBOOK INC. DATA PRIVACY CONCERNS, (Feb. 18, 2021) https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

118. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[59] When a user was having their period or informed the app of their intention to get pregnant, Flo would inform Facebook, which could then use the data for targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[60]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

119. More recently, Facebook employees admitted to lax protections for sensitive user data. In 2021, Facebook engineers on the ad business product team conceded "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[61]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

---

[59] Justin Sherman, Your Health Data Might Be for Sale, SLATE (June 22, 2022 at 5:50 a.m.) https://slate.com/technology/2022/06/health-data-brokers-privacy.html.

[60] *Id.*

[61] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document, VICE (April 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.

120. In June 2022, an investigation by The Markup[62] revealed that the Meta Pixel was embedded on the websites of 33 of the top 100 hospitals in the nation.[63] On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data," including sensitive personal health information, whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.[64] The data is connected to an IP address, which is "an identifier that's like a computer's mailing address and can generally be linked to a specific individual or household—creating an intimate receipt of the appointment request for Facebook."[65]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

121. During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also patients' names, addresses, email addresses, and phone numbers.[66]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

122. In addition to the 33 hospitals identified by The Markup that had installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.[67]

---

[62] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. *See* www.themarkup.org/about (last accessed Mar. 19, 2023).

[63] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, Facebook Is Receiving Sensitive Medical Information from Hospital Websites, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

123. David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated he was "deeply troubled" by what the hospitals capturing and sharing patient data in this way.[68]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

**D. Defendant Violated HIPAA Standards**

124. Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[69]

**ANSWER:** Defendant denies that this paragraph accurately reflects the terms of HIPAA. Defendant denies that it violated HIPAA.

125. Guidance from the U.S. Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

126. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data... If such information was listed with health condition, health care provision,

---

[68] *Id.*

[69] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[70]

**ANSWER:** Defendant admits that this paragraph purports to quote a portion of guidance relating to HIPAA, but denies that it fully or accurately reflects its contents or that it violated any such guidance. Defendant denies all remaining allegations.

127. In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. ... Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[71]

**ANSWER:** Defendant admits that this paragraph purports to quote a portion of guidance relating to HIPAA, but denies that it fully or accurately reflects its contents or that it violated any such guidance. Defendant denies all remaining allegations.

128. In addition, HHS's Office for Civil Rights (OCR) issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[72]

**ANSWER:** Defendant admits that this paragraph purports to reference a portion of a bulletin from HHS, but denies that it fully or accurately reflects its contents

---

[70] U.S. Department of Health and Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[71] U.S. Department of Health and Human Services, Marketing, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[72] *See* U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

or that it violated any such bulletin. Defendant denies all remaining allegations.

129. According to the Bulletin, "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information."[73]

**ANSWER:** Defendant admits that this paragraph purports to quote a portion of a bulletin from HHS, but denies that it fully or accurately reflects its contents or that it violated any such bulletin. Defendant denies all remaining allegations.

130. The HHS Bulletin notes that such information—even when sent to an "unauthenticated webpage" (*i.e.*, a webpage that does not require users to log in before accessing the webpage) —constitutes a disclosure of PHI to the tracking technology vendor.[74]

**ANSWER:** Defendant admits that this paragraph purports to reference a portion of a bulletin from HHS, but denies that it fully or accurately reflects its contents or that it violated any such bulletin. Defendant denies all remaining allegations.

131. Citing The Markup's June 2022 article, the Bulletin expressly notes:

> Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.
>
> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an

---

[73] *Id.*

[74] U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

> individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [75]

**ANSWER:** Defendant admits that this paragraph purports to quote a portion of a bulletin from HHS, but denies that it fully or accurately reflects its contents or that it violated any such bulletin. Defendant denies all remaining allegations.

132. In other words, HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel violates HIPAA Rules.

**ANSWER:** Denied.

**E. Defendant Violated FTC Standards, and the FTC and HHS Take Action**

133. The Federal Trade Commission ("FTC") has also recognized that implementation of the Meta Pixel and other tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[76]

**ANSWER:** Defendant admits that Plaintiff purports to quote the FTC, but denies that it fully or accurately does so or that this alleged publication is admissible. Defendant denies all allegations in this paragraph relating to its conduct.

134. On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[77]

---

[75] *Id.* (emphasis in original) (internal citations omitted).

[76] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), **Exhibit A to Plaintiff's Complaint.**

[77] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-

**ANSWER:** Defendant admits that Plaintiff purports to quote a document, but denies that it fully or accurately does so or that this alleged publication is admissible. Defendant denies all allegations in this paragraph relating to its conduct.

135. Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[78] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes."[79]

**ANSWER:** Defendant admits that Plaintiff purports to quote a document, but denies that it fully or accurately does so or that this alleged publication is admissible. Defendant denies all allegations in this paragraph relating to its conduct.

136. Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id.* According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization*, triggers notification obligations under the Rule."[80]

**ANSWER:** Defendant admits that Plaintiff purports to quote a document, but denies that it fully or accurately does so or that this alleged publication is

---

events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm source=govdelivery.

[78] *Id.*

[79] *Id.*

[80] Statement of the Commission: On Breaches by Health Apps and Other Connected Devices, U.S. Fed. Trade Commission, (Sept. 15, 2021) (available at https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf) (emphasis added).

admissible. Defendant denies all allegations in this paragraph relating to its conduct.

137. Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[81]

**ANSWER:** Defendant admits that Plaintiff purports to quote a document, but denies that it fully or accurately does so or that this alleged publication is admissible. Defendant denies all allegations in this paragraph relating to its conduct.

138. As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

**ANSWER:** Denied.

**F. Defendant Violated Industry Standards**

139. A medical provider's duty of confidentiality is a cardinal rule, embedded in doctor-patient and hospital-patient relationships.

**ANSWER:** Denied.

140. The American Medical Association's ("AMA") Code of Medical Ethics requires the protection of patient privacy and communications, and these rules are applicable to Memorial Hospital and its physicians.

**ANSWER:** Denied.

---

[81] *See, e.g.*, U.S. v. Easy Healthcare Corp., Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legallibrary/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; In the Matter of BetterHelp, Inc., FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; U.S. v. GoodRx Holdings, Inc., Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; In the Matter of Flo Health Inc., FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/casesproceedings/192-3133-flo-health-inc.

141. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

**ANSWER:** Defendant admits only that Plaintiff purports to quote AMA Code of Medical Ethics Opinion 3.1.1, but denies that it fully or accurately quotes that opinion or that it violated any such opinion. Defendant denies all remaining allegations.

142. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

**ANSWER:** Defendant admits only that Plaintiff purports to quote AMA Code of Medical Ethics Opinion 3.2.4, but denies that it fully or accurately quotes that opinion or that it violated any such opinion. Defendant denies all remaining allegations.

143. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

**ANSWER:** Defendant admits only that Plaintiff purports to quote AMA Code of Medical Ethics Opinion 3.3.2, but denies that it fully or accurately quotes that opinion or that it violated any such opinion. Defendant denies all remaining allegations.

**G. Plaintiff's and Class Members' Expectation of Privacy**

144. At all times when Plaintiff and Class Members provided their Private Information to Defendant, they had a reasonable expectation that the information would remain private and that

Defendant would not share the Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.

**ANSWER:** Denied.

**H. IP Addresses are Personally Identifiable Information**

145. Defendant also disclosed Plaintiff and Class Members' IP addresses to Facebook, Google, and others through its use of the Meta Pixel and other tracking technologies.

**ANSWER:** Denied.

146. An IP address is a number that identifies the address of a device connected to the Internet.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

147. IP addresses are used to identify and route communications on the Internet.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

148. IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

149. Facebook tracks every IP address ever associated with a Facebook user.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

150. Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

151. Under HIPAA, an IP address is Personally Identifiable Information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code," specifically listing IP addresses as an example of PII. *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

**ANSWER:** Denied.

152. Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards

**ANSWER:** Denied.

**I. Defendant Was Enriched and Benefitted from the Use of Trackers and Unauthorized Disclosures**

153. The sole purpose for Defendant's use of the Meta Pixel and other tracking technology was to enhance its marketing efforts and increase its profits.

**ANSWER:** Denied.

154. In exchange for disclosing the Private Information of its patients, Defendant was compensated by Facebook, Google, and likely others in the form of enhanced advertising services and more cost-efficient marketing.

**ANSWER:** Denied.

155. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

**ANSWER:** Defendant denies allegations about its conduct. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations.

156. By utilizing the Meta Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

**ANSWER:** Denied.

**J. Plaintiff's and Class Members' Private Information Had Financial Value**

157. The data concerning Plaintiff and Class Members, collected and shared by Defendant, has tremendous economic value. Data collected via the Meta Pixel, CAPI, and other online tracking tools allows Facebook to build its own massive, proprietary dataset, to which it then sells access in the form of targeted advertisements. Targeting works by allowing advertisers to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[82] Facebook's "Core Audiences" allow advertisers to target individuals based on demographics, such as age, location, gender, or language, whereas "Custom Audiences" allow advertisers to target individuals who have "already shown interest in your business," by visiting a business's website, using an app, or engaging in certain online content.[83] Facebook's "Lookalike Audiences" go further, targeting individuals who resemble current customer profiles and whom, according to Facebook, "are likely to be interested in your business."[84]

**ANSWER:** Defendant denies the allegedly collected and shared data has tremendous economic value or that it shared such data concerning Plaintiff and Class Members. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations.

158. Plaintiff had a recognizable property interest in her browsing history. That browsing history has economic value, and by sharing, or facilitating the sharing of, such information with third parties such as Google and Facebook without prior approval, Memorial Hospital took something of value from Plaintiff and provided it to third parties without

---

[82] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting
[83] *Id.*
[84] *See* How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Center, https://www.facebook.com/business/help/465262276878947

compensating Plaintiff for the use of her Private Information and data, thus, causing the Plaintiff economic injury.

**ANSWER:** Denied.

159. Plaintiff's Private Information, which was taken by Defendant without permission, had value even though it was not "for sale." The browsing history and data mined from individuals using the internet has significant economic value. If it did not have value, then entire industries that sell and trade this data would not exist. There is an entire data industry and estimates suggest that that industry generates billions of dollars.

**ANSWER:** Denied.

160. Data harvesting is big business, and it drives Facebook's profit center, its advertising sales. In 2019, Facebook generated nearly $70 billion dollars in advertising revenue alone, constituting more than 98% of its total revenue for that year.[85]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

161. This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

162. In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How

---

[85] *See* Here's How Big Facebook's Ad Business Really Is, CNN, https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html

Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, it described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[86]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

163. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[87]

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

164. The applicable statutes of limitation have been tolled as a result of Memorial Hospital's knowing and active concealment and denial of the facts alleged herein.

**ANSWER:** Denied.

165. Memorial Hospital seamlessly incorporated Meta Pixel and other trackers into its Website and Online Platforms while providing patients with no indication that their Website usage was being tracked and transmitted to third parties. Memorial Hospital knew that its Website incorporated Meta Pixel and other trackers, yet it failed to disclose to Plaintiff and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, Google, DoubleClick, Simpli.fi, AppNexus, and Microsoft.

**ANSWER:** Denied.

---

[86] *See* Adam Tanner, How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry, TIME, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.

[87] *See* Christina Farr, Hospital Execs Say They are Getting Flooded with Requests for Your Health Data, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

166. Even while exercising due diligence, Plaintiff and Class Members could not have discovered the full scope of Memorial Hospital's conduct, because there were no disclosures or other indications that they were interacting with websites employing Meta Pixel or any other tracking technology.

**ANSWER:** Denied.

167. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Memorial Hospital's illegal interception and disclosure of Plaintiff's Private Information has continued unabated through at least December 29, 2023. What is more, Memorial Hospital was under a duty to disclose the nature and significance of its data collection practices but did not do so. Memorial Hospital, therefore, is estopped from relying on any statute of limitations defenses.

**ANSWER:** Denied.

## CLASS ALLEGATIONS

168. Plaintiff brings this nationwide class action on behalf of herself and on behalf of other similarly situated persons.

**ANSWER:** Denied.

169. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> **All patients of Defendant whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

**ANSWER:** Denied.

170. Further, Plaintiff seeks to represent an Illinois Subclass, defined as:

> **All patients of Defendant who are Illinois citizens and whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

**ANSWER:** Denied.

171. The Nationwide Class and Illinois Subclass are collectively referred to as "the Class."

**ANSWER:** Denied.

172. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

**ANSWER:** Denied.

173. Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

**ANSWER:** Denied.

174. This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23(a)(1)-(4).

**ANSWER:** Denied.

175. Numerosity: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds or thousands of individuals whose Private Information may have been improperly accessed in the Disclosure, and each Class is apparently identifiable within Defendant's records.

**ANSWER:** Denied.

176. Commonality: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include

a. whether and to what extent Defendant had a duty to protect Plaintiff's and Class Members' Private Information;

b. whether Defendant had duties not to disclose the Plaintiff's and Class Members' Private Information to unauthorized third parties;

c. whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for non-healthcare purposes;

d. whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for unauthorized purposes;

e. whether Defendant failed to adequately Plaintiff's and Class Members' Private Information;

f. whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g. whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

h. whether Defendant failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential communications and Private Information;

i. whether Defendant's conduct breached its duties of care and amounts to negligence;

j. whether Defendant was negligent *per se*;

k. whether Defendant breached its implied contract with Plaintiff and the Class Members; or in the alternate, whether Defendant was unjustly enriched;

l. whether Defendant breached a bailment it had with Plaintiff and the Class Members;

m. whether Defendant's conduct violated the Illinois Eavesdropping Statute, 720 Ill. Comp. Stat. 5/14, *et seq.*;

n. whether Defendant's conduct violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), *et seq.*;

o. whether Defendant's conduct violated the Electronic Communications Privacy Act, 18 U.S.C. § 2511(3)(a) ("Unauthorized Divulgence By Electronic Communications Service");

p. whether Defendant's conduct violated Title II of the Electronic Communications Privacy Act, 18 U.S.C. § 2702, *et seq.*;

q. whether Defendant's conduct violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*

r. whether Plaintiff and the Class Members are entitled to damages, including actual, compensatory, and nominal damages;

s. the measure of Plaintiff's and the Class Members' damages; and,

t. whether Plaintiff and the Class Members are entitled to punitive damages

**ANSWER:** Denied.

177. Typicality: Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use and incorporation of Meta Pixel and other tracking technology.

**ANSWER:** Denied.

178. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the

Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

**ANSWER:** Denied.

179. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff has suffered is typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

**ANSWER:** Denied.

180. Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

**ANSWER:** Denied.

181. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to

afford relief to Plaintiff and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

**ANSWER:** Denied.

182. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

**ANSWER:** Denied.

183. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

**ANSWER:** Denied.

184. Unless a Class-wide injunction is issued, Defendant may continue in their unlawful disclosure and failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding Disclosure, and Defendant may continue to act unlawfully as set forth in this Complaint.

**ANSWER:** Denied.

185. Further, Defendant have acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

**ANSWER:** Denied.

186. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a. whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

d. whether Defendant was negligent and/or negligent *per se*;

e. whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that contract;

f. whether Defendant breached the contract;

g. in the alternate, whether Defendant was unjustly enriched;

h. whether Defendant breached a bailment it had with Plaintiff and the Class Members;

i. whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been used and disclosed to third parties;

j. whether Defendant failed to implement and maintain reasonable security procedures and practices;

k. whether Defendant violated the Illinois Eavesdropping Statute, 720 Ill. Comp. Stat. 5/14, *et seq.*;

l. whether Defendant's conduct violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), *et seq.*;

m. whether Defendant's conduct violated the Electronic Communications Privacy Act, 18 U.S.C. § 2511(3)(a) ("Unauthorized Divulgence By Electronic Communications Service");

n. whether Defendant's conduct violated Title II of the Electronic Communications Privacy Act, 18 U.S.C. § 2702, *et seq.*;

o. whether Defendant's conduct violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*; and,

p. whether Plaintiff and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**ANSWER:** Denied.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

187. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

**ANSWER:** Defendant incorporates its answers to the preceding paragraphs as fully set forth herein.

188. Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' Private Information in its care and custody,

including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.

**ANSWER:** Denied.

189. Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiff's and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.

**ANSWER:** Denied.

190. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiff's and Class Members' Private Information.

**ANSWER:** Denied.

191. Defendant's duty arose as a result of industry standards and the physician-patient relationship to keep patients' Private Information, PHI and PII of Plaintiff and the Class Members, gathered in that relationship secret; as well as due to Defendant collecting Private Information from patients online.

**ANSWER:** Denied.

192. Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way of data harvesting, advertising, and increased sales.

**ANSWER:** Denied.

193. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in the handling and securing of Private Information of Plaintiff and Class Members, and by failing to disclose Defendant was gathering Private Information, including PHI and PII, and sharing it with third parties without authorization, beyond the scope of the physician-patient relationship. This failure actually and proximately caused Plaintiff's and Class Members' injuries.

**ANSWER:** Denied.

194. As a direct, proximate, and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or imminently will suffer injury and damages, including monetary damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

**ANSWER:** Denied.

195. Defendant's breach of its common-law duties to exercise reasonable care and negligence, directly and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of their Private Information by third parties; improper disclosure of their Private Information; receipt of targeted advertisements reflecting private medical information; lost benefit of their bargain; lost value of their Private Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress; lost time and money incurred to mitigate and remediate the effects of use of their information, as to targeted advertisements that resulted from and were caused by Defendant's negligence; value to Plaintiff and the Class Members of surrendering their choices to keep their Private Information private and allowing Defendant to track their data; increased risk of future

harm resulting from future use and disclosure of Plaintiff's and the Class Members' Private Information; and other injuries and damages as set forth herein. These injuries are ongoing, imminent, immediate, and continuing.

**ANSWER:** Denied.

196. Moreover, Plaintiff's and the Class Members' foregoing personal injury and property damage was a sudden and dangerous occurrence because Plaintiff and the Class entrusted their Private Information to Defendant within the scope the physician-patient relationship with the expectation that information would be kept confidential, and yet Memorial Hospital suddenly, and without warning, disclosed that Private Information to others outside of the physician-patient relationship, without Plaintiff's and the Class Members' knowledge, consent, or authorization.

**ANSWER:** Denied.

197. Defendant's negligence directly and proximately caused the unauthorized access and Disclosure of Plaintiff's and Class Members' Private Information, PII and PHI, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

**ANSWER:** Denied.

198. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**ANSWER:** Denied.

**COUNT II**
**NEGLIGENCE *PER SE***

**(On Behalf of Plaintiff and the Class)**

199. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

**ANSWER:** Defendant incorporates its answers to the preceding paragraphs as fully set forth herein.

200. Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, and Illinois law, including the Illinois Medical Patient Rights Act ("MPRA"), 410 Ill. Comp. Stat. 50/3(d), and the Illinois Personal Information Protection Act ("IPIPA"), 815 Ill. Comp. Stat. 530/5, /45, *et seq*., Defendant was required by law and industry standards to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members' Private Information.

**ANSWER:** Denied.

201. Plaintiff and Class Members are within the class of persons that these statutes and rules were designed to protect.

**ANSWER:** Denied.

202. Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII and PHI.

**ANSWER:** Denied.

203. Defendant owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

**ANSWER:** Denied.

204. It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiff's and Class Members' PII and PHI in compliance with applicable laws would result in an unauthorized third-parties such as Facebook, and others gaining access to Plaintiff's and Class Members' PII and PHI, and resulting in Defendant's liability under principles of negligence *per se*.

**ANSWER:** Denied.

205. Defendant violated its duty under Section 5 of the FTC Act and/or HIPAA and/or under Illinois law by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII and PHI and not complying with applicable industry standards as described in detail herein; as well as failing to disclose Defendant was gathering Private Information, including PHI and PII, and sharing it with third parties without authorization, beyond the scope of the physician-patient relationship.

**ANSWER:** Denied.

206. Plaintiff's and Class Member's PII and PHI constitute personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiff and Class Members.

**ANSWER:** Denied.

207. As a direct, proximate, and traceable result of Defendant's negligence *per se* and breach of duties as set forth above, Plaintiff and Class Members were caused to, *inter alia*, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which

there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

**ANSWER:** Denied.

208. Defendant's breach of its duties and negligence *per se*, directly and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of their Private Information by third parties; improper disclosure of their Private Information; receipt of targeted advertisements reflecting private medical information; lost benefit of their bargain; lost value of their Private Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress; lost use of their Private Information without compensation, and interference with their possession of their information; invasion of their privacy rights; lost time and money incurred to mitigate and remediate the effects of use of their information, as to targeted advertisements that resulted from and were caused by Defendant's negligence *per se*; value to Plaintiff and the Class Members of surrendering their choices to keep their Private Information private and allowing Defendant to track their data; increased risk of future harm resulting from future use and disclosure of Plaintiff's and the Class Members' Private Information; and other injuries and damages as set forth herein. These injuries are ongoing, imminent, immediate, and continuing.

**ANSWER:** Denied.

209. Moreover, Plaintiff's and the Class Members' foregoing personal injury and property damage was a sudden and dangerous occurrence because Plaintiff and the Class entrusted their Private Information to Defendant within the scope the physician-patient relationship with the expectation that information would be kept confidential, and yet Memorial Hospital suddenly, and

without warning, disclosed that Private Information to others outside of the physician-patient relationship, without Plaintiff's and the Class Members knowledge, consent, or authorization.

**ANSWER:** Denied.

210. Defendant's negligence *per se* directly and proximately caused the unauthorized access and Disclosure of Plaintiffs' and Class Members' Private Information, PII and PHI, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

**ANSWER:** Denied.

211. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's negligence *per se*, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**ANSWER:** Denied.

**COUNT III**
**BREACH OF EXPRESS CONTRACT**
**(On Behalf of Plaintiff and the Class)**

**Because this count was dismissed, no response should be necessary. But, Plaintiff engaged in impermissible group pleading that incorporated these allegations into other counts. Defendant therefore responds to these allegations solely to avoid any suggestion that it admitted these allegations. It does not, however, admit that Plaintiff can pursue this claim.**

212. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

**ANSWER:** Defendant incorporates its answers to the preceding paragraphs as fully set forth herein.

213. Plaintiff brings this claim for breach of express contract in the alternate to her negligence and negligence *per se* causes of action.

**ANSWER:** Denied.

214. Plaintiff and the proposed Class Members and Defendant entered into an express agreement whereby Defendant agreed to provide medical care and treatment, and that in the course of providing said treatment, Memorial Hospital would not disclose Plaintiff's and the Class's Private Information, including PHI, except as authorized.

**ANSWER:** Denied.

215. In exchange, Plaintiff and the proposed Class Members paid monies for treatment received and entrusted their Private Information to Defendant.

**ANSWER:** Denied.

216. The express contact between Plaintiff and the Class on the one hand, and Defendant on the other, was set forth in written Privacy Policies, including, but not limited to, Memorial Hospital's Privacy Statement and Patient Rights and Responsibilities,[88] in which Defendant promised only to disclose Plaintiff's and the Class Members' PHI for marketing purposes with said patients' written authorization.

**ANSWER:** Denied.

217. Plaintiff and Class Members fully performed their obligations under the express contract with Defendant. Memorial Hospital did not. Plaintiff and Class Members would not have provided their confidential Private Information to Defendant, and paid monies for treatment, in the absence of their express contracts with Defendant in which Memorial Hospital promised to protect

[88] *See* Memorial Hospital Patient Rights and Responsibilities, available at https://www.mhtlc.org/utility/patients-rights-responsibilities/, and Memorial Hospital's Privacy Statement, available at https://www.mhtlc.org/utility/privacy-statement/.

their Private Information, and Plaintiff and the Class would have instead retained the opportunity to control their Private Information for uses other than receiving medical treatment from Defendant.

**ANSWER:** Denied.

218. Defendant breached the express contract with Plaintiff and the Class Members by disclosing their Private Information to third parties including Facebook, Google, and others, without written authorization, and in failing to apprise Plaintiffs and the Class Members of the unauthorized Disclosure, in violation of Memorial Hospital's Privacy Policies.

**ANSWER:** Denied.

219. As a direct and proximate result of Defendant's breach of contract, Plaintiff and the Class have suffered (and will continue to suffer) injury-in-fact and damages, including monetary damages; loss of privacy; unauthorized disclosure of Private Information; unauthorized access to Private Information by third parties; use of the Private Information for advertising purposes; embarrassment, humiliation, frustration, and emotional distress; decreased value of Private Information; lost benefit of the bargain; and increased risk of future harm resulting from further unauthorized use and disclosure of their information.

**ANSWER:** Denied.

220. Further, non-economic damages are available to Plaintiff and the Class Members because when Plaintiff and the Class Members entered into the express contract, Defendant knew, or had reason to know, that its breach would cause mental suffering due to the disclosure and invasion of privacy itself, beyond mere pecuniary loss.

**ANSWER:** Denied.

221. Specifically, Defendant knew, or had reason to know, that disclosing, without authorization, Private Information including PHI and PII to Facebook and other third parties, contrary to promises Defendant made, would cause mental suffering by virtue of the Disclosure,

given that such information should reasonably be expected to be held in confidence and not disclosed to unauthorized third parties.

**ANSWER:** Denied.

222. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

**ANSWER:** Denied.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the Class)**

**Because this count was dismissed, no response should be necessary. But, Plaintiff engaged in impermissible group pleading that incorporated these allegations into other counts. Defendant therefore responds to these allegations solely to avoid any suggestion that it admitted these allegations. It does not, however, admit that Plaintiff can pursue this claim.**

223. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

**ANSWER:** Defendant incorporates its answers to the preceding paragraphs as fully set forth herein.

224. As a condition of receiving medical care from Defendant, Plaintiff and the Class provided their Private Information and paid compensation for the treatment received.

**ANSWER:** Denied.

225. In so doing, Plaintiff and the Class entered into contracts with Defendant by which Defendant agreed to safeguard and protect such information, in its Privacy Policies and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen. Implicit in the agreement between Defendant and its patients, Plaintiff and the proposed Class Members, was the obligation that both parties would maintain the Private Information confidentially and securely.

**ANSWER:** Denied.

226. Memorial Hospital had an implied duty of good faith to ensure that the Private Information of Plaintiff and Class Members in its possession was only used only as authorized, such as to provide medical treatment, billing, and other medical benefits from Defendant.

**ANSWER:** Denied.

227. Defendant had an implied duty to protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses.

**ANSWER:** Denied.

228. Additionally, Defendant implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

**ANSWER:** Denied.

229. Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant. Memorial Hospital did not. Plaintiff and Class Members would not have provided their confidential Private Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Private Information for uses other than receiving medical treatment from Defendant.

**ANSWER:** Denied.

230. Defendant breached the implied contracts with Plaintiff and Class members by disclosing Plaintiff's and Class Members' Private Information to unauthorized third parties, including Facebook, Google, and others.

**ANSWER:** Denied.

231. Defendant's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their Private Information in exchange for medical treatment and benefits.

**ANSWER:** Denied.

232. As a direct and proximate result of Defendant's breach of contract, Plaintiff and the Class have suffered (and will continue to suffer) injury-in-fact and damages, including monetary damages; loss of privacy; unauthorized disclosure of Private Information; unauthorized access to Private Information by third parties; use of the Private Information for advertising purposes; embarrassment, humiliation, frustration, and emotional distress; decreased value of Private Information; lost benefit of the bargain; and increased risk of future harm resulting from further unauthorized use and disclosure of their information.

**ANSWER:** Denied.

233. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

**ANSWER:** Denied.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

234. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

**ANSWER:** Defendant incorporates its answers to the preceding paragraphs as fully set forth herein.

235. This claim is pleaded in the alternative to Plaintiff's breach of implied contract claim.

**ANSWER:** Denied.

236. Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of valuable sensitive medical information—Private Information—that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant

collected, used, and disclosed this information for its own gain, for marketing purposes, and for sale or trade with third parties.

**ANSWER:** Denied.

237. Plaintiff and Class Members would not have used Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their Private Information to third parties.

**ANSWER:** Denied.

238. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

**ANSWER:** Denied.

239. As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy practices and procedures that Plaintiff and Class Members paid for, and those purchases with unreasonable data privacy practices and procedures that they received.

**ANSWER:** Denied.

240. The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members themselves. Under unjust enrichment principles, it would be inequitable for Defendant to retain the profit and/or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Petition.

**ANSWER:** Denied.

241. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of the conduct and the unauthorized Disclosure alleged herein.

**ANSWER:** Denied.

**COUNT VI**
**BAILMENT**
**(On Behalf of Plaintiff and the Class)**

**Because this count was dismissed, no response should be necessary. But, Plaintiff engaged in impermissible group pleading that incorporated these allegations into other counts. Defendant therefore responds to these allegations solely to avoid any suggestion that it admitted these allegations. It does not, however, admit that Plaintiff can pursue this claim.**

242. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

**ANSWER:** Defendant incorporates its answers to the preceding paragraphs as fully set forth herein.

243. Plaintiff, the Class, and Defendant contemplated a mutual benefit bailment when Plaintiff and Class members transmitted their Private Information to Defendant solely for treatment and the payment thereof.

**ANSWER:** Denied.

244. Plaintiff's and the Class's Private Information was transmitted to Defendant in trust for a specific and sole purpose of receiving Memorial Hospital's medical treatment services, with an express contract that the trust was to be faithfully executed, and the Private Information was to be accounted for when the special purpose was accomplished.

**ANSWER:** Denied.

245. Defendant was duty bound under the law to exercise ordinary care and diligence in safeguarding Plaintiff's and the Class's Private Information.

**ANSWER:** Denied.

246. Plaintiff's and the Class's Private Information was used for a different purpose than the Plaintiff and the Class intended, for a longer time period and/or in a different manner or place than the parties intended. Instead of being used to facilitate their medical treatment, Plaintiff's and

the Class Members' Private Information was used by Defendant to benefit Memorial Hospital and its marketing and advertising purposes.

**ANSWER:** Denied.

247. Defendant's breach of the bailment was a legal cause of injury-in-fact and damage to Plaintiff and the Class, including but not limited to, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, emotional distress and embarrassment and humiliation, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's tortious conduct. These injuries are ongoing, imminent, immediate, and continuing.

**ANSWER:** Denied.

248. As a direct and proximate result of Defendant's breach of the bailment, Plaintiff and Class Members are entitled to and do demand actual, compensatory, and punitive damages, as well as injunctive relief, and all other relief allowed by law.

**ANSWER:** Denied.

**COUNT VII**
**VIOLATION OF THE ILLINOIS EAVESDROPPING STATUTE,**
**720 Ill. Comp. Stat. 5/14, *et seq*.**
**(On Behalf of Plaintiff and the Class)**

**Because this count was dismissed, no response should be necessary. But, Plaintiff engaged in impermissible group pleading that incorporated these allegations into other counts. Defendant therefore responds to these allegations solely to avoid any suggestion that it admitted these allegations. It does not, however, admit that Plaintiff can pursue this claim.**

249. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

**ANSWER:** Defendant incorporates its answers to the preceding paragraphs as fully set forth herein.

250. The Eavesdropping Article of the Illinois Criminal Code (the "Illinois Eavesdropping Statute" or "IES") states that it is a felony for any person to knowingly and intentionally "use[] an eavesdropping devise, in a surreptitious manner, for the purpose of transmitting or recording all or part of any private conversation to which he or she is a party unless he or she Gittings-Barreras so with the consent of all other parties to the private conversation." 720 Ill. Comp. Stat. 5/14-2(a), -4.

**ANSWER:** Denied.

251. The IES also states that it is a felony for any person to knowingly and intentionally "use[] or disclose[] any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties." *Id*.

**ANSWER:** Denied.

252. For purposes of the IES, "eavesdropping device" means "any device capable of being used to hear or record oral conversation or intercept, or transcribe electronic communications whether such conversation or electronic communication is conducted in person, by telephone, or by any other means." 720 Ill. Comp. Stat. 5/14-1(a).

**ANSWER:** Denied.

253. For purposes of the IES, "surreptitious" means "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 Ill. Comp. Stat. 5/14-1(g).

**ANSWER:** Denied.

254. For purposes of the IES, "private electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under

circumstances reasonably justifying that expectation. . . . Electronic communication does include any communication from a tracking device." 720 Ill. Comp. Stat. 5/14-1(e).

**ANSWER:** Denied.

255. "A reasonable expectation shall include any expectation recognized by law, including, but not limited to, an expectation derived from a privilege, immunity, or right established by common law, Supreme Court rule, or the Illinois or United States Constitution." *Id.*

**ANSWER:** Denied.

256. Defendant intentionally recorded and/or acquired Plaintiff's and Class Members' private electronic communications, without the consent of Plaintiff and Class Members, using the Pixel and similar tracking technologies on its Online Platforms.

**ANSWER:** Denied.

257. Defendant intentionally recorded and/or acquired Plaintiff's and Class Members' private electronic communications for the purpose of disclosing those communications to third parties, including Facebook and Google, without the knowledge, consent, or written authorization of Plaintiff or Class Members.

**ANSWER:** Denied.

258. Plaintiff's and Class Members' communications with Defendant constitute private conversations, communications, and information.

**ANSWER:** Denied.

259. Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Online Platforms.

**ANSWER:** Denied.

260. Plaintiff and Class Members communicated sensitive PHI and PII that they intended for only Defendant to receive and that they understood Defendant would keep private.

**ANSWER:** Denied.

261. Plaintiff and Class Members have a reasonable expectation that Defendant would not disclose PII, PHI, and confidential communications to third parties without Plaintiff's or Class Members' authorization, consent, or knowledge.

**ANSWER:** Denied.

262. Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's representations, Privacy Policies, and HIPAA. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential.

**ANSWER:** Denied.

263. Plaintiff and Class Members were unaware that their Private Information was being surreptitiously recorded and transmitted to third parties as they communicated with Defendant through its Online Platforms.

**ANSWER:** Denied.

264. Without Plaintiff's or Class Members' knowledge, authorization, or consent, Defendant used the Pixel imbedded and concealed into the source code of its Online Platforms to secretly record and transmit Plaintiff's and Class Members' private communications to hidden third parties, such as Facebook and Google, as described in the preceding paragraphs.

**ANSWER:** Denied.

265. Under the IES, "[a]ny or all parties to any conversation or electronic communication upon which eavesdropping is practices contrary to this Article shall be entitled to the following remedies: (a) [t]o an injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either; (b) [t]o all actual damages against the

eavesdropper or his principal or both; [t]o any punitive damages which may be awarded by the court or by a jury. . . .” 720 Ill. Comp. Stat. 5/14-6.

**ANSWER:** Denied.

266. The eavesdropping devices used in this case include, but are not limited to:

a. Plaintiff’s and Class Members’ personal computing devices;

b. Plaintiff’s and Class Members’ web browsers;

c. Plaintiff’s and Class Members’ browser-managed files;

d. Facebook’s Pixel;

e. Internet cookies;

f. Other tracking technology including Google Analytics with Google Tag Manager (“GTM”), DoubleClick Ads, the Trade Desk, and Frequence;

g. Defendant’s computing servers;

h. Third-party source code utilized by Defendant; and

i. Computer servers of third-parties (including Facebook) to which Plaintiff’s and Class Members’ communications were disclosed.

**ANSWER:** Denied.

267. The eavesdropping devices outlined above are not excluded “tracking devices” as that term is used in the IES, 720 ILCS 5/14-1(e), to the extent that they perform functions other than collection of geo-locational data.

**ANSWER:** Denied.

268. Defendant is a “person” under the IES. 720 Ill. Comp. Stat. 5/2-15.

**ANSWER:** Denied.

269. Defendant aided in the interception of communications between Plaintiff and Class Members and Defendant that were redirected to and recorded by third parties without Plaintiff's or Class Members' consent.

**ANSWER:** Denied.

270. Under the IES, Plaintiff and the Class Members are entitled to injunctive relief prohibiting further eavesdropping by Defendant, actual damages, and punitive damages.

**ANSWER:** Denied.

271. Defendant's violation of the IES caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members

b. intended to remain private is no longer private;

c. Defendant eroded the essential confidential nature of the physician-patient relationship;

d. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

e. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

f. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information.

**ANSWER:** Denied.

272. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**ANSWER:** Denied.

**COUNT VIII**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. §§ 2511(1), *et seq.***
**(On Behalf of Plaintiff and the Class)**

273. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

**ANSWER:** Defendant incorporates its answers to the preceding paragraphs as fully set forth herein.

274. The ECPA protects both sending and receipt of communications. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

**ANSWER:** Denied.

275. The transmissions of Plaintiff's and Class Members' Private Information to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

**ANSWER:** Denied.

276. **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,...data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

**ANSWER:** Denied.

277. **Content**. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(8).

**ANSWER:** Denied.

278. **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents...include any information concerning the substance, purport, or meaning of that communication." See 18 U.S.C. § 2510(4), (8).

**ANSWER:** Denied.

279. **Electronic, Mechanical or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device...which can be used to intercept a[n]...electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;
b. Plaintiff's and Class Members' computing devices;
c. Defendant's web-servers; and
d. Defendant's Website.

**ANSWER:** Denied.

280. The tracking technology deployed by Defendant effectuated the sending and acquisition of patient communications.

**ANSWER:** Denied.

281. By utilizing and embedding the tracking technology on its Website, Defendant intentionally intercepted, endeavored to intercept and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

**ANSWER:** Denied.

282. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the tracking technology including the Pixel, which tracked, stored ,and unlawfully disclosed Plaintiff's and Class Members' Private Information to Facebook, Google, DoubleClick, the Trade Desk, and Frequence.

**ANSWER:** Denied.

283. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding Private Information, and medical treatment.

**ANSWER:** Denied.

284. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

**ANSWER:** Denied.

285. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

**ANSWER:** Denied.

286. **Unauthorized Purpose.** Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

**ANSWER:** Denied.

287. Defendant intentionally used the wire or electronic communications to increase its profit margins and save on marketing costs.

**ANSWER:** Denied.

288. Defendant specifically used the Pixel to track and to utilize Plaintiff's and Class Members' Private Information for financial gain.

**ANSWER:** Denied.

289. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

**ANSWER:** Denied.

290. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy via the tracking technology.

**ANSWER:** Denied.

291. In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of its Website, Defendant's purpose was tortious, criminal and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation or matter that would be highly offensive to a reasonable person; and (ii) violation of HIPAA, the FTC Act, invading Plaintiff and Class Members' privacy, and in breach of its fiduciary duty of confidentiality.

**ANSWER:** Denied.

**COUNT IX**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(3)(a)**

**UNAUTHORIZED DIVULGENCE BY ELECTRONIC COMMUNICATIONS SERVICE**
**(On Behalf of Plaintiff and the Class)**

292. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

**ANSWER:** Defendant incorporates its answers to the preceding paragraphs as fully set forth herein.

293. The ECPA statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

**ANSWER:** Denied.

294. **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant's Website is an electronic communication service which provides to users thereof, patients of Defendant, the ability to send or receive electronic communications; in the absence of Defendant's Website, internet users could not send or receive communications regarding Plaintiff's and Class Members' Private Information.

**ANSWER:** Denied.

295. **Intentional Divulgence**. Defendant intentionally designed the tracking technology and was or should have been aware that, if so configured, it could divulge Plaintiff's and Class Members' Private Information. Upon information and belief, Defendant's divulgence of the contents of Plaintiff's and Class Members' communications was contemporaneous with their exchange with Defendant's Website, to which they directed their communications.

**ANSWER:** Denied.

296. Defendant divulged the contents of Plaintiff's and Class Members' electronic communications without authorization and/or consent.

**ANSWER:** Denied.

297. **Exceptions do not apply**. In addition to the exception for communications directly to an electronic communications service ("ECS")[89] or an agent of an ECS, the ECPA states that "[a] person or entity providing electronic communication service to the public may divulge the contents of any such communication."

a. "as otherwise authorized in section 2511(2)(a) or 2517 of this title;

b. "with the lawful consent of the originator or any addressee or intended recipient of such communication;" c. "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or d. "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency." U.S.C. § 2511(3)(b).

**ANSWER:** Denied.

298. Section 2511(2)(a)(i) provides: It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his

[89] An ECS is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

**ANSWER:** Denied.

299. Defendant's divulgence of the contents of Plaintiff's and Class Members' communications to Facebook was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of Defendant's service nor (ii) necessary to the protection of the rights or property of Defendant.

**ANSWER:** Denied.

300. Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

**ANSWER:** Denied.

301. Defendant's divulgence of the contents of Plaintiff's and the Class Members' patient user communications on its Website through the tracking technology was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (i) Plaintiff and Class Members did not authorize Defendant to divulge the contents of their communications and (ii) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiff and Class Members were exchanging information.

**ANSWER:** Denied.

302. Moreover, Defendant divulged the contents of Plaintiff's and Class Members' communications through the Pixel code to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

**ANSWER:** Denied.

303. The contents of Plaintiff's and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

**ANSWER:** Denied.

304. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

**ANSWER:** Denied.

## COUNT X
## VIOLATION OF TITLE II OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("STORED COMMUNICATIONS ACT") 18 U.S.C. § 2702, *et seq.* (On Behalf of Plaintiff and the Class)

305. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

**ANSWER:** Defendant incorporates its answers to the preceding paragraphs as fully set forth herein.

306. The ECPA further provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

**ANSWER:** Denied.

307. **Electronic Communication Service**. ECPA defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant intentionally procures and embeds various Plaintiff's and Class Members' patient Private Information through the tracking

technology used on Defendant's Website, which qualifies as an Electronic Communication Service.

**ANSWER:** Denied.

308. **Electronic Storage**. ECPA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

**ANSWER:** Denied.

309. Defendant stores the content of Plaintiff's and Class Members' communications on Defendant's Website and files associated with it.

**ANSWER:** Denied.

310. When Plaintiff or Class Members make a Website communication, the content of that communication is immediately placed into storage.

**ANSWER:** Denied.

311. Defendant knowingly divulges the contents of Plaintiff's and Class Members' communications through the tracking technology.

**ANSWER:** Denied.

312. **Exceptions Do Not Apply**. Section 2702(b) of the Stored Communication Act provides that an electronic communication service provider "may divulge the contents of a communication—" a. "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." b. "as otherwise authorized in Section 2517, 2511(2)(a), or 2703 of this title;" c. "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service;" d. "to a person employed or authorized or whose facilities are used to forward such communication to its

destination;" e. "as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service;" f. "to the National Center for Missing and Exploited Children, in connection with a reported submission thereto under section 2258A." g. "to a law enforcement agency, if the contents (i) were inadvertently obtained by the service provider; and (ii) appear to pertain to the commission of a crime;" h. "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency"; or "to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies Section 2523."

**ANSWER:** Denied.

313. Defendant did not divulge the contents of Plaintiff's and Class Members' communications to "addressees," "intended recipients," or "agents" of any such addressees or intended recipients of Plaintiff and Class Members.

**ANSWER:** Denied.

314. Section 2517 and 2703 of the ECPA relate to investigations by government officials and have no relevance here.

**ANSWER:** Denied.

315. Section 2511(2)(a)(i) provides: It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his

service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

**ANSWER:** Denied.

316. Defendant's divulgence of the contents of Plaintiff's and Class Members' communications on its Website to Facebook or other third parties was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of the Defendant's services nor (ii) necessary to the protection of the rights or property of Defendant.

**ANSWER:** Denied.

317. Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

**ANSWER:** Denied.

318. Defendant's divulgence of the contents of Plaintiff's and Class Members' patient user communications on its Website was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (i) Plaintiff and Class Members did not authorize Defendant to divulge the contents of their communications and (ii) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiff and Class Members were exchanging information.

**ANSWER:** Denied.

319. Moreover, Defendant divulged the contents of Plaintiff's and Class Members' communications through the tracking technology to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

**ANSWER:** Denied.

320. The contents of Plaintiff's and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

**ANSWER:** Denied.

321. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

**ANSWER:** Denied.

**COUNT XI**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT ("CFAA")**
**18 U.S.C. § 1030, *et seq.***
**(On Behalf of Plaintiff and the Class)**

**Because this count was dismissed, no response should be necessary.**

**DEFENDANT'S AFFIRMATIVE DEFENSES**

1. Plaintiff has failed to state a claim upon which relief can be granted.

2. Plaintiff has failed to sufficient plead with particularity the remaining causes of action.

3. Plaintiff's claims are barred by the applicable statute of limitations.

4. Plaintiff's lack standing to assert their claims.

5. Plaintiff's claims for equitable and/or injunctive relief are barred to the extent there is an adequate remedy at law.

6. Plaintiff's claims are barred to the extent they have failed to mitigate any losses.

7. Plaintiff's claims are barred by the doctrine of unjust enrichment.

8. Plaintiff's claims are barred by reasonable reliance on facts that may later prove to be false and/or made a bona fide error despite using reasonable efforts to avoid such an error.

9. Plaintiff's claims are barred by the doctrines of Laches, Waiver, Release, Estoppel, Ratification, Consent, Good Faith, Unclean Hands and Inequitable Conduct.

10. Plaintiff's claims are barred because Defendant was a party to any and all alleged communications, therefore no actionable interception occurred.

11. Plaintiff's claims are barred to the extent an intervening or superseding cause is established.

12. Plaintiff's action may not properly be maintained as a class action.

13. Plaintiff's claims are barred by contract to the extent they entered into valid relevant Agreements related to the claims in the action.

14. Plaintiff's claims are barred or limited by any binding limitation of liability provision in any valid contract.

15. Plaintiff's claims are barred, in whole or in part, to the extent that they seek unrecoverable damages and/or attorney's fees; and or unauthorized remedies that are unconstitutional, contrary to public policy, otherwise unauthorized, or not recognized by applicable state law.

16. Plaintiff's claims are barred by the statute of limitations, and laches.

17. Plaintiff's claims are barred by comparative fault.

18. Defendant reserves the right to assert and pursue additional defenses that may become known through discovery or otherwise.

Respectfully submitted,

**GORDON REES SCULLY MANSUKHANI, LLP**

By: /s/ Scott L. Schmookler
Scott L. Schmookler
One N. Wacker Dr., Suite 1600
Chicago, IL 60606
Telephone: (312) 565-1400
Facsimile: (312) 565-6511
sschmookler@grsm.com

***Attorney for Defendant Memorial Hospital Association d/b/a Memorial Hospital***

**CERTIFICATE OF SERVICE**

I hereby certify that on October 22, 2025, I caused the foregoing to be served via e-file and serve to all counsel of record.

By: /s/ Scott L. Schmookler

Scott L. Schmookler
One N. Wacker Dr., Suite 1600
Chicago, IL 60606
Telephone: (312) 565-1400
Facsimile: (312) 565-6511
sschmookler@grsm.com

***Attorney for Defendant Memorial Hospital Association d/b/a Memorial Hospital***